UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.                                        Criminal #  04-10372 WGY

GEORGE KANDIRAKIS

## DEFENDANT'S OJECTIONS TO THE COURT'S PROPOSED JURY VERDICT FOR (POSING DRUG WEIGHT QUESTION TO THE JURY)

Defendant George Kandirakis submits this memorandum in response to the Court's

proposed Jury Verdict Form (Posing Drug Weight Question to the Jury).

I.      THE GOVERNMENT DID NOT CHARGE, AND FAILED TO PROVE, WEIGHT IN
        THE CONSPIRACY AND THEREFORE HAS FAILED TO PROVE AN ESSENTIA.
        ELEMENT OF THE CRIME AND KANDIRAKIS MUST BE FOUND NOT GUILTY

At the time the Supreme Court decided *Almendarez-Torrez v. United States*, 523 U.S.

224 (1998), the sentence enhancing interpretation of drug type and threshold drug amounts was

already settled precedent in the Courts of Appeals. In *Almendarez-Torrez*, the Court establishe

a painstaking methodology of statutory inquiry into whether Congress, without expressly sayin

so, Congress intended to create drug type and threshold drug amounts as a "sentencing factor"

rather than an offense element. 523 U.S. at 228-39. A court must "look to the statute's

language, structure, subject matter, context and history – factors that typically help courts

determine a statute's objectives and thereby illuminate its text." *Almendarez-Torres*, 523 U.S., a

228, see also *Castillo v. United States*, 530 U.S. 120 (2000); *Jones v. United States*, 526 U.S.

227, 232-39 (1999). *Almendarez-Torres* adopted much of its methodology from the lower cour

cases construing drug type and amount as sentence-enhancing facts. 523 U.S. at 234-36. It is

then, no small irony that the *Almendarez-Torres* analysis reveals that the lower courts sentenc:

enhancing fact interpretation of section 841 is wholly without foundation.

A.    The Supreme Courts Decision In *Mcmillan* Does Not Substantiate An Inference
      That Quantity Is A Sentencing Factor, Rather Than An Element Of The Offens:

It is settled that legislative bodies may define sentencing factors, so long as they compo

with constitutional safeguards as expressed, for example in *Apprendi.*. Yet that *McMillan*

upheld a State statute explicitly providing for the imposition of mandatory minimum sentences

on a judicial finding of sentencing factors, does not reveal what role Congress intended for dru

quantity in the CSA. The similarity between the two statutes begins and ends with the fact tha

both contain mandatory minimum sentences. Whether Congress *intended* drug type and amou

to be sentencing factors in the CSA cannot be discerned by reference to *McMillan.*

For at least 16 years after Congress passed the CSA of 1970, the courts of appeals

generally considered the type and amount of a drug to be elements of a § 841 offense.[1] In this

Circuit, several cases illustrate the point. In *United States v. McHugh*, 769 F.2d 860 (1st Cir.

1985), the defendant "was indicted and convicted of conspiring to possess and of possessing

approximately 1,379 pounds, 9 ounces of marijuana in violation of sections 846, 841(a) and

841(b)(6)" of the CSA as amended in 1980. *Id.* at 867. He challenged the trial court's failure,

after the jury verdict, to grant his motion for judgment of acquittal with respect to § 841(b)(6).

This Court avoided the issue based on the fact that the sentence imposed did not exceed the five

year maximum authorized by §§ 841(b)(1)(B) (1980 ver.) and 846 (1980 ver.). *Id.* at 868.

---

[1]  *See, e.g.*, *United States v. Crockett*, 812 F.2d 626, 628-29 (10th Cir. 1987); *United States v. Buishas*, 791 F.2d 1310, 1317 (7th Cir. 1986); *United States v. McHugh*, 769 F.2d 860, 868 (1st Cir. 1985); *United States v. Wright*, 742 F.2d 1215, 1220-21 (9th Cir. 1984); *United States v. Alvarez*, 735 F.2d 461, 466-68 (11th Cir. 1984); *United States v. Pope*, 561 F.2d 663, 669-70 (6th Cir. 1977); *United States v. Estell*, 539 F.2d 697, 699 (10th Cir. 1976) ("the presence and identity of the drug is the thing and ... the quantity is not important" under 1970 Act).

Although there is language in the opinion to the effect that § 841(b)(6) is an "enhanced penalt:
provision," *id.*, nothing in the opinion holds, or even suggests, that the facts predicate to the
penalty provision were to be assigned to the judge for determination at sentencing. *Id.* Indeed
the opinion states that "the amount of marijuana is *an essential offense element of the offense*
only under 21 U.S.C. § 841(b)(6)." *Id.* (emphasis added). Other decisions of this Court
established that drug type was an offense element under the CSA. *United States v. Garcia-Ros*
876 F.2d 209, 216, (1st Cir. 1989) (proof beyond a reasonable doubt of drug type; simultaneou:
possession of two drug types is two offenses); *United States v. McMahon*, 861 F.2d 8, 10-13 (1
Cir. 1988) (variance of indictment and proof; sufficiency of the evidence of drug type to suppo
the jury verdict); *United States v. Bonilla-Romero*, 836 F.2d 39 (1st Cir. 1987) ("each of the tw
violations in question here requires proof of an independent fact; *i.e.*, the identity of the drugs
themselves").[2]

Then, in 1986, the Supreme Court decided *McMillan*. After, and in express or implied
reliance upon, *McMillan*, every circuit court of appeal read drug type or amount, or both, out of
the elements of a § 841 offense. *See United States v. Barnes*, 890 F.2d 545, 551 n.6 (1st Cir.
1989)(type and amount).[3] In *Barnes*, the district court had instructed the jury on the type and

---

[2]The decision in *McMahon* well illustrates the illogic of attempting to deem drug type to be a
sentencing factor, not an element. Proof beyond a reasonable doubt of "a controlled substance'
is simply impossible without proof of a *particular* controlled substance.

[3]*United States v. Lewis*, 113 F.3d 487, 489-92 (3d Cir. 1997) (type); *United States v. Patrick*, 9:
F.2d 991, 995 n.5 (D.C. Cir. 1992)(amount); *United States v. McCann*, 940 F.2d 1352, 1354,
1358 (10th Cir. 1991)(amount); *United States v. Sotelo-Rivera*, 931 F.2d 1317, 1319 (9th Cir.
1991)(amount); *United States v. Campuzano*, 905 F.2d 677, 679 (2d Cir. 1990) (amount). *Unite
States v. Moreno*, 899 F.2d 465, 472-74 (6th Cir. 1990)(amount); *United States v. Powell*, 886
F.2d 81, 84-85 (4th Cir. 1989)(amount); *United States v. Acevedo*, 891 F.2d 607, 611 (7th Cir.
1989); *United States v. Smith*, 840 F.2d 886, 888 (11th Cir. 1988)(amount); *United States v.
Morgan*, 835 F.2d 79, 81 (5th Cir. 1987)(amount); *United States v. Wood*, 834 F.2d 1382, 1388-
90 (8th Cir. 1987)(amount); *United States v. Gibbs*, 813 F.2d 596 (3d Cir. 1987)(amount under
1980 amend.)

amount of drugs and the jury. Without inquiring into congressional intent, the Court lowered 1

government's burden of proof and substituted the judge for the jury as fact-finder thus avoidin

the defendant's challenge that the government failed to prove drug amount beyond a reasonabl

doubt. *Id.*; *see also United States v. Lindia*, 82 F.3d 1154, 1160-61 & n.5 (1ˢᵗ Cir. 1996)

(reiterating the *Barnes* post-*McMillan* holding, and relying on *McMillan* to find no due proces:

violation). In later cases, three-judge panels of the First Circuit erroneously read *McHugh* to

mean that drug amount is *never* an element of the offense. *See*, *e.g.*, *United States v. Paine*, 93

F.2d 397, 400 (1ˢᵗ Cir. 1991).

The post-*McMillan* reinterpretation of the role of drug amount constitutes an applicatio:

of the "dynamic view of statutory interpretation, under which the text might mean one thing

when enacted yet another if the prevailing view of the Constitution later changed," which the

Supreme Court condemned in *Harris*. Kandirakis presents this Court an opportunity to correct

course.

    B.    Congress Created Drug Amount (and Type) as Elements

        1.  *Where Congress Intends A Sentencing Factor, It Has So-Stated Explicitly;*
            *Congress Did Not Include Drug Amount and Type As Sentencing Factors*

"Congress's failure to include drug type and quantity within its express

sentence-enhancement provisions indicates its intent to treat these factors as elements of a

crime." *Vazquez*, 271 F.3d at 111 (Becker, Ch.J., concurring in judgment); *cf. Jones*, 526 U.S. ;

233; *Almendarez-Torres*, 523 U.S. at 249 (Scalia, J., dissenting). When Congress intended

sentence-enhancing factors in the original Controlled Substances Act ("CSA") of 1970, it

expressly said so. For example, Congress made prior convictions a basis for increasing the

statutory maximum punishment, CSA § 401(b). Congress unambiguously and expressly provide

that recidivism was to be determined "after conviction but before pronouncement of sentence,"

21 U.S.C. § 851(b) (1994 ed.), in a hearing "before the court without a jury," albeit with the fa

to be determined "beyond a reasonable doubt." *Id.* § 851(c)(1). *See also* 21 U.S.C. § 849 (19'

ed.) (repealed) (special dangerous drug offender sentencing).

The CSA of 1970 did not include any express provision to create sentence-enhancing

factors with respect to drug type (and no drug amounts appeared). Since drug type and prior

convictions appeared in § 841(b), Congress' decision not to include drug type in the original

§ 851 demonstrates that Congress chose to treat only prior convictions as sentence-enhancing

facts, with all other operative facts remaining elements. *Gozlon-Peretz v. United States*, 498

U.S. 395, 404 (1990) (Congress presumed in CSA to act intentionally and purposely in dispara

inclusion or exclusion). Because Congress did not include drug amount, when it was later add

to the statute, in § 851, or otherwise expressly designate it as a sentencing factor, Congress

intended it to be an offense element. *See id.*

### 2.    *No Strict Dichotomy between Subsections (a) & (b) Exists*

The First Circuit construes a strict dichotomy between subsection (a) (defining element

and subsection (b) (defining sentencing factors), but no such dichotomy exists. To the contrary

the language of Section 841 (entitled "Prohibited Acts—Penalties" in the Statutes at Large)

shows that subsection 841(b), not subsection 841(a), creates criminal offenses. It defines those

offenses by the elements of drug type and amount.

Subsection (a) makes certain acts *unlawful* but is incomplete as a penal statute because i

does not provide punishment. *Cf. Jones*, 526 U.S. at 233-34 (statutory description of "some ver

obnoxious behavior" alone fails to state a crime because it neither concluded with "shall be guil

of a felony" nor "shall be punished [or 'fined and imprisoned,' etc.]"). It is black letter law that

prohibition without a specified penalty creates no crime. *See*, Wayne R. LaFave & Austin W.

Scott, *Substantive Criminal Law* § 1.2(d), at 12-13 (1986); *see United States v. Evans*, 333 U.S 483, 486, 490-99 (1948). Rather, as the Supreme Court recently explained, subsection 841(a) creates a "statutory prohibition," subject to both civil and criminal enforcement. *United States Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483, 499 (2001); *see also id.* at 486, 494 n.7

That § 841(a) merely creates a "statutory prohibition" is confirmed in § 842, a parallel provision of the CSA ("Prohibited acts B—Penalties" in the Statutes at Large). It, too, makes certain acts "unlawful." 21 U.S.C. § 842(a). Section 842(a) only states a "statutory prohibition because a violation of § 842(a) "does not constitute a crime" except as provided in § 842(c)(2). 21 U.S.C. § 842(a), (c)(3) (1994 ed.). *See United States v. Richardson*, 529 U.S. 813, 819 (1999). As with § 842(a), the act provides criminal offenses for violations of § 841(a); in the case of § 841, these are in § 841(b)(1-3).

Subsection (b), in contrast to § 841(a), is complete as a criminal statute. In its unnumbered preamble, subsection (b) uses the active voice ("any person who violates subsectic (a) ...."), which the Court deems typical offense-defining language. *Carter*, 530 U.S. at 272-73 Subsection (b) expressly incorporates an act in violation of subsection (a) as an element of a subsection (b) offense. The "violates subsection (a)" language also appears in other sections of the CSA, as amended. 21 U.S.C. §§ 849, 859-61. These sections have been consistently construed to define offenses, not sentencing provisions. *See, e.g., United States v. Chandler*, 12 F.3d 892, 896 (5th Cir. 1997) (§ 860, which expressly incorporates a violation of § 841(a), just does § 841(b), is greater-inclusive offense of § 841); *United States v. McQuilken*, 78 F.3d 105, 108 (3d Cir. 1996) (same).

Subsection (b), unlike subsection (a), contains punishment-introducing language followe by punishment. 21 U.S.C. § 841(b). In fact, each subparagraph of paragraph (b)(1) contains a

primary punishment-authorizing sentence. In that sentence, a punishment-introducing clause

appears twice, in the unnumbered preamble following "violates subsection (a)" and also

following the specification of covered drug types and amounts. *See*, *e.g.*, *id.* § 841(b)(1)(B).

The single sentence containing the two punishment-introducing clauses reads like a traditional

defined crime. For example:

> [A]ny person who violates subsection (a) of this section
> shall be sentenced as follows: ... (1)(B) In the case of a
> violation of subsection (a) of this section involving— (iii) 5
> grams or more of a mixture or substance described in
> clause (ii) [cocaine] which contains cocaine base; . . . such
> person shall be sentenced to a term of imprisonment which
> may not be less than 5 years or more 40 years and if death
> or serious bodily injury results from the use of such
> substance shall not be less than 20 years or more than life, a
> fine not to exceed the greater of that authorized by title 18
> or $2,000,000 if the defendant is an individual ..., or both.
> 21 U.S.C. § 841(b)(1)(C).

Like drug type and amount, the operative fact of causation of death or bodily injury

appears in the primary offense-defining sentence when recidivism is not involved. In *Jones*, 52

U.S. at 236-37, the Court held that death and injury-causation are traditional elements, not

traditional sentencing factors.

In § 841(b)(1)(B), immediately following the primary offense-defining sentence, a singl

sentence defines the consequences of recidivism and recidivism combined with death or seriou:

bodily injury. This sentence, which appears in each of the subparagraphs of § 841(b)(1), refers

to "such a violation," which grammatically can refer only to the violation defined in the primar:

offense-defining sentence contained in that subparagraph.

As with the weapon type in *Castillo*, drug type and amount appear in a single sentence

with other elements, separate from the following complete sentences that address traditional

sentencing concerns, such as recidivism. "These structural features strongly suggest that the

basic job of the entire first sentence is the definition of crimes and the role of the remaining ...
sentences is the description of factors (such as recidivism) that ordinarily pertain only to
sentencing." *Castillo*, 530 U.S. at 125.

The subsection headings "Unlawful acts" and "Penalties"—as they appear in the Unite
States Code,[4] do not justify a finding of sentencing factors as opposed to elements of the offen
The Act Congress passed does not contain those headings. *See*, Controlled Substances Act of
1970, Pub. L. 91-513, Title II, §§ 401-10, Oct. 27, 1970, *reprinted in* Stat.L. 1466-68, 91st
Cong., 2d Sess.; *see also* 116 Cong. Rec. 33624-25 (1970). The Office of the Federal Register,
National Archives and Records Services added a reference to "penalties" as a margin note to th
Statutes at Large after Congress passed the Act. 84 Stat. 1260; *see* 44 U.S.C. § 729 (1994 ed.).
Only the bill number and date is required by law, *see id.*, and such margin notes are mere findii
tools for users' convenience. *Cf. United States v. Detroit Lumber Co.*, 200 U.S. 321, 337 (190(
(court syllabus). When the CSA was reproduced in the United States Code, the editors convert
the margin notes into subsection headings. *See generally* 2 U.S.C. §§ 285a, 285b(1) & (3) (199
ed.). Because Title 21, unlike some others, has not been codified, the Statutes at Large, not the
United States Code, are the authoritative source of law. *Id.* § 285b(3); 2 U.S.C., Supp. IV, at vi
(1998). Congress did not enact these headings in the 1984 or 1986 amendments. Thus, no
subheadings exist in the controlling statute. *Accord United States v. Buckland*, 289 F.3d 558,
565-66 (9th Cir. 2002); *Vazquez*, 271 F.3d at 111 (Becker, Ch. J., concurring). Accordingly, the
fact that the headings appear in the uncodified Title 21 of the United States Code tells the Court
nothing about the underlying intent of Congress.

---

[4]*Lewis*, 113 F.3d at 490-91; *United States v. Sotelo-Rivera*, 931 F.2d 1317, 1319 (9th Cir. 1991)
*cert. denied*, 502 U.S. 1100 (1992); *United States v. Moreno*, 899 F.2d 465, 472-74 (6th Cir.
1990); *United States v. Barnes*, 890 F.2d 545, 551 n.6 (1st Cir. 1989); *United States v. Wood*, 83
F.2d 1382, 1388-90 (8th Cir. 1987).

Moreover, such uncodified headings are inaccurate as indicators of where elements are defined. *See, e.g.,* 21 U.S.C. § 842(c)(2)(A) (1994 ed.) (offense defined under "penalties" heading); 21 U.S.C. § 848(a) (1970 ed.) (distinct crime entitled "Penalties; forfeitures"). Whei created a separate, complete offense in § 841(b)(7), Congress itself enacted a title line, "Penalt for Distribution." 110 Stat. 3807. Congress often uses "penalty" to distinguish crimes from ci prohibitions.

### 3. *Congress Created a Dual-axis Allowable Unit of Prosecution*

The First Circuits' speculation that Congress would not create multiple offenses in a single statute, *Goodine*, 2003 U.S. App. Lexis 6733, at * 18, is unfounded. Correctly read, subsection (b) is the offense defining provision, within which Congress created an "efficient double-axis prosecution scheme, under which each act in violation of what is now § 841(a) (manufacture, distribute, etc) could be prosecuted with respect to different drug types." *Vazqu* 271 F.3d at 109 (Becker, Ch. J.). That reading comports with pre-CSA federal drug laws, und which offense elements were narrowly defined so that offenses could be cumulated. *Blockburger v. United States*, 284 U.S. 299, 302 (1932) (each sale is a crime); *Normandale v. United States*, 201 F.2d 463, 464 (5th Cir. 1953) (each drug is a separate element).

In fact, before *McMillan v. Pennsylvania*, 477 U.S. 79 (1986), courts routinely employe this double axis prosecution scheme under the CSA. *United States v. Grandison*, 783 F.2d 115 1156 (4th Cir. 1986) (possession of each scheduled substance is a separate offense); *United Sta v. Elliot*, 849 F.2d 886, 888-90 (4th Cir. 1988) (each distribution is separate offense); *cf. Promi* 255 F.3d at 175 (Luttig, J., concurring in judgment) (disputing "double-axis" thesis by doubtin; Congress created 350 different offenses).

The idea that § 841(a) contains all offense elements (and that drug type is a sentencing factor) is simply inconsistent with Congress' intent to unify federal drug laws in a single statute without relaxing their preexisting punitive force. *Vazquez*, 271 F.3d at 109; *United States v. Davis*, 656 F.2d 153, 156-60 (5th Cir. 1981). Reducing drug type to a sentencing factor constri the reach of § 841 by broadly defining the drug element—a change from pre-CSA law and one inconsistent with this Court's *Bonilla-Romero* decision allowing consecutive sentences for ea drug type precisely because drug type is an element. *Bonilla-Romero*, 836 F.2d at 46-47.[5]

The history and structure of the CSA suggest that Congress had other goals, consistent with making drug type an element, that led it to structure § 841 as it did. First, Congress intended to unify in a single statute the "plethora of legislation" creating drug offenses in diver public health and revenue acts. H. Rep. No. 91-1444, 91 Cong. 2d Sess. (1970), [1970] U.S. Code Cong. & Admin. News, 4566, 4571; *see also* 116 Cong. Rec. 33300, 33304 (1970). Second, § 841 is but one section of a larger efficient, flexible structure for both criminalizing some and regulating other transactions in controlled substances. *See Id.* § 812 (providing five schedules of controlled substances and standards and procedures for additions and reclassifications); 21 U.S.C., Part C (regulation of legal drug industry via the five schedules). Creating a complete traditional offense for each scheduled substance would have destroyed the utility of the schedules for Congress's purposes.

_____

[5] Presumably, Judge Luttig believes Congress created "some 350" *sentencing factors* without an express word saying so. The panel decision asseverates that the "practical result of [its] ruling' prevents § 841(b) from creating 350 different offenses, thus (supposedly) justifying the sentenc in this case. The "practical result" is decidedly impractical in light of *Collazo-Aponte*. Under *Collazo-Aponte*, the very facts the panel decision says are sentencing factors are "converted" in offense elements for purposes of raising the statutory maximum sentence. The result is that the self same facts create as many as 350 offense elements, for some purposes, and 350 sentencing factors, for others. Turning the panel decision's logic against itself, *amici* suggest that "[s]uch interpretation causes difficulty we think Congress did not intend." *Goodine*, 2003 U.S. App. Lexis 6733, at *18.

4.    *The Legislative History of the CSA of 1970 Shows No Non-Recidivism Sentencing Factors Were Intended in § 841*

The legislative history of the CSA of 1970 reveals that no non-recidivist

sentencing factors were intended in § 841. Congress expressed no intent in 1970 to make

drug type a sentencing factor rather than an element. (Amount was statutorily irrelevant

in the original CSA.) The legislative history discusses "penalties" corresponding to

"violations," which is unremarkable in the context of a discussion of a penal statute.

H.Rep. No. 91-1444, 91st Cong. 2d Sess. (1970), [1970] U.S. Code Cong. & Admin.

News, at 4567, 4570, 4571, 4574, 4575-79, 4614, 4618. No inference that the report

meant "sentence-enhancing fact" or "sentencing factor" when it said "penalty" can be

drawn. In fact, the report subsection entitled "Criminal Penalties," *id.* at 4575, leads with

a discussion of the new continuing criminal enterprise offense, which Congress clearly

intended to be a separate offense. *See Garrett v. United States*, 471 U.S. 773, 783-84

(1980); *cf. Jones*, 526 U.S. at 237-38 (finding "unimpressive" the Government's equating

of "penalty enhancement" with "sentencing factor"); *Castillo*, 530 U.S. at 128-30

(similar).

The legislative history of the 1970 Act referring to "sentencing procedures"

giving "maximum flexibility to judges," *Goodine*, 2003 U.S. App. Lexis 6733, at *16, is

misplaced. "Flexibility" did not refer to sentencing factors, but rather to the elimination,

in 1970, of almost all mandatory minimum sentencing provisions from the federal drug

laws. H.R. Conf. Rep. 91-1444 1970, *reprinted in*, 1970 U.S.C.C.A.N. 4566, 4576.

Congress recognized that the mandatory minimum sentences contained in the pre-CSA

statutes created problems. *Id.* Judges were unable to craft sentences accounting for the

11

circumstances of the individual defendants. *Id.* Prosecutors were reluctant to prosecute

violations because they viewed the penalties as disproportionate. *Id.* Mandatory

penalties made convictions harder to obtain. *Id.* In response to these problems, Congress

did not create a sentencing factor regime. Rather, it made "the penalty structure in the

law more flexible" to eliminate the "difficulties . . . arising out of minimum mandatory

sentences." *Id.* The express sentencing factors Congress debated in 1970 were addressed

in the legislative history quite apart from its discussion of judicial flexibility in

sentencing[6].

The absence of any intent to make operative facts (aside from prior convictions)

into sentencing factors under § 841 is shown by the debates over sections 408 and 409 of

the CSA, 21 U.S.C. § 848 (continuing criminal enterprise) and 21 U.S.C. § 849 (1970)

[repealed] (dangerous special drug offender sentencing). Due to constitutional objections

foreshadowing *Apprendi*, the proposed new continuing criminal enterprise provision was

---

[6]The House Report states:

> The foregoing sentencing procedures give maximum flexibility to
> judges, permitting them to tailor the period of imprisonment, as well as the
> fine, to the circumstances involved in the individual case.

> The severity of existing penalties, involving in many instances
> minimum mandatory sentences, have led in many instances to reluctance
> on the part of prosecutors to prosecute some violations, where the
> penalties seem to be out of line with the seriousness of the offense. In
> addition, severe penalties, which do not take into account individual
> circumstances, and which treat casual violators as severely as they treat
> hardened criminals, tend to make convictions somewhat more difficult to
> obtain. The committee feels, therefore, that making the penalty structure
> in the law more flexible can actually serve to have more of a deterrent
> effect than existing penalties, through eliminating some of the difficulties
> prosecutors and courts have had in the past arising out of minimum
> mandatory penalties.

*Id.*

12

explicitly changed from a sentencing factor provision into an offense. H. Rep. No.

91-1444, [1970] U.S. Code Cong. & Admin. News, at 4651 (additional views).  On the

other hand, when the CSA came to the House floor, the special dangerous drug offender

sentencing provision was introduced, vigorously debated (again along lines

foreshadowing *Apprendi*) and ultimately added to the CSA.  CSA § 409; 116 Cong. Rec.

33633 (1970); 116 Cong. Rec. 33633-34 (1970); 116 Cong. Rec. 33661 (1970).  Yet,

even the author of the sentencing provision agreed that the traditional right to trial by jury

attached to violations of the CSA predicate to the special sentencing provisions.  *Id.* at

33634.  Under the former § 849, predicate violations included § 841 offenses.  The

absence of similar debate on § 841 confirms that Congress did not intend to change pre-

CSA practice and re-designate drug type as a sentence-enhancing fact.

### 5.  *The Legislative History Shows that Drug Amount is an Element*

The legislative history of post-1970 amendments shows that threshold drug

amount is an element. In the *Infant Formula Act of 1980*, Pub. L. 96-359, § 8(c)(2), Sept.

29, 1980, 94 Stat. 1260, Congress first added a threshold drug amount (at least 1000

pounds of marijuana) as an element in the former § 841(b)(6), using offense-creating

language similar to that later contained in subparagraphs (1)(A) and (B).  Both the House

and Senate Reports state, "[i]ndividuals *convicted* of trafficking in over 1,000 pounds

would be subject to a maximum 15 year prison sentence and/or a maximum $125,000

fine." H. Rep. 96-936, 96th Cong. 2d Sess. 13 (1980); S. Rep. 96-916, 96th Cong. 2d

Sess. 14 (1980) (emphasis added). Congress used the word "convicted" advisedly and

because it intended amount to be an element of the offense. *See Vazquez*, 271 F.3d at 109

(Becker, Ch.J., concurring in judgment).

In 1984, Congress adopted the former § 841(b)(1)(A). Both the Justice
Department, which drafted the provision, *see* H. Doc. 98-32, 98th Cong. 1st Sess., and
the Senate Report note that, except for marijuana, the prior law did not account for the
important factor of drug amount. Thus, Congress created "a new subparagraph (A) under
§ 841(b)(1) that would provide, for *offenses* involving large amounts of particularly
dangerous drugs, higher penalties than those now provided under section 841." S. Rep.
98-225, 98th Cong., 1st Sess. 258 (1983)(emphasis added). "The use of the plural
'offenses' indicates Congress's intention to create within a single statute a multitude of
separate crimes depending on drug type and quantity." *Vazquez*, 271 F.3d at 110
(Becker, Ch.J.); *cf. Promise*, 255 F.3d at 175 (Luttig, J., concurring in judgment).

In 1986, Congress, using the internal structure of subparagraph (b)(1)(A) of the
1984 amendments, created new subparagraphs (b)(1)(A) and (B) and reintroduced
mandatory minimum sentences for offenses under those subparagraphs. Again, the
legislative history contains no discussion referencing sentence-enhancing facts. The
Government was involved in the hearings, and assured Congress that prosecutors could
present evidence of drug amount passing the sufficiency-of-the-evidence test (which
applies to convictions, not sentencing), by introducing into evidence testimony about
large drug transactions, rather than drugs themselves in the threshold quantities. H. Rep.
99-845, Part 1, 99th Cong., 2d Sess., at 12 (1986); *accord Vazquez*, 271 F.3d at 110
(Becker, Ch.J.). Thus, the government and Congress understood that proof of threshold
amounts of drugs was necessary for convictions; were drug amounts mere sentencing
factors, they of course would not be discussed in the context of the guilt phase of trial.

Relying on an out-of-context snippet of the 1970 legislative history, the panel

suggests that Congress, in 1986, reintroduced mandatory minimum sentences, predicated

upon judicially determined sentencing factors,  to give "maximum flexibility to judges."

*Goodine*, 2003 U.S. App. Lexis 6377 at *16.  The legislative history of the 1986

amendments, however, reflects that the mandatory minimum sentences were created to

restrict, not enhance, judicial discretion. The mandatory minimum provisions were a

product of congressional hostility to the exercise of judicial discretion in sentencing drug

offenders.  Senate Majority Leader Byrd explained how the mandatory minimum

sentences attaching to amount-based offenses would preclude judges from exercising

sentencing discretion in favor of convicted drug offenders:

> [A major drug dealer] must know that no matter how good
> a lawyer he gets, ... that lawyer will not be able to get him
> out of jail *once he has been found guilty in a court of law*.
>                                             \*\*\*
>
> [The amendments] will require that for *certain crimes
> involving drugs*, the *convicted defendant*, must -- I repeat
> must -- be sentenced to the penitentiary. ... It will not be a
> matter of discretion for these *types of crimes.*  It will be a
> requirement imposed by law on the sentencing judge.
> 132 Cong. Rec. S14301 (daily ed. Sept. 30, 1986).

*See also* H. Rep. 99-845, Part 1, 99th Cong., 2d Sess., at 19 ("A person *convicted under*

*those subparagraphs* [(b)(1)(A) & (B)] shall not be eligible for parole until the individual

has served the minimum sentences required by such subparagraphs") (emphasis added).

The reference to "convictions" under subparagraphs (b)(1)(A) and (b)(1)(B)

demonstrates that the predicate facts of drug type and quantity were deemed elements by

Congress. It would be decidedly odd for Congress to constrain judicial discretion by

assigning fact-finding to the very judges sought to be constrained.

15

Although the Supreme Court decided *McMillan* four months before Congress passed the 1986 amendments to § 841, nothing in the text or legislative history indicates that Congress defined drug type and amount in § 841 in reliance upon *McMillan. Cf. Apprendi*, 530 U.S. at 487 n.13; *see also id.* at 564 (Breyer, J., dissenting) (citing § 841(b) as an example of possible legislative reliance on *McMillan*). Rather, the language, structure and legislative history of § 841 is consistent with the long-standing tradition of treating type and amount facts as offense elements for jury determination. *See* M.D. Knoll & Richard G. Singer, "Searching for the 'Tail of the Dog': Finding 'Elements' of Crimes in the Wake of *McMillan v. Pennsylvania*," 22 Seattle Univ. L.Rev. 1057 (1999). Moreover, in 1988 -- after many circuits had begun reversing course and describing § 841(b) as containing only *McMillan*-esque "sentencing factors" -- Congress amended § 841(b)(1)(A) (in the third complete sentence) to contain an internal reference to "a violation of this subparagraph," thus confirming in the text of § 841(b) itself that the offense, and not merely "sentencing factors," are found therein.

The Justice Department understood that Congress created drug type and amount as offense elements. Immediately following the 1986 amendments, the Department of Justice published its understanding of the amendments. *Handbook on the Anti-Drug Abuse Act of 1986*, at 1-9, 13-17, 20-21 (March 1987). The *1986 Handbook* repeatedly refers to *convictions* under the subparagraphs of § 841(b)(1). *Id.* at 3-4, 6-7. The Department referred to "a 'lesser included offense' in which the quantity of the controlled substance in question is not specified ...." *1986 Handbook*, at 8-9. The Handbook also "recommends" that to invoke penalties "based upon the *kind* and *quantity* of drug involved in particular offenses," prosecutors should allege and prove at trial drug type

16

and amount. *Id.* at 20 (emphasis in original). The *1986 Handbook* properly distinguished *McMillan* as relating to a mandatory minimum provision *expressly* to be determined at sentencing. *Handbook* at 21. The government's understanding as demonstrated in the *1986 Handbook* is further persuasive evidence of Congress' determination to identify drug type and amount in § 841(b)(1) as offense elements. *Vazquez*, 271 F.3d at 110-11 (Becker, Ch J., concurring).

Contrary to its fundamentally sound analysis of drug type and amount as § 841 offense elements in the *1986 Handbook*, the Department of Justice later seized on the early post-*McMillan* sentence-enhancing fact cases, and adopted and enforced a national policy to avoid juries and lower its burden of proof in drug cases.[7] Thus, before the Supreme Court adopted the painstaking statutory inquiry of *Almendarez-Torres*, the government secured an erroneous unanimity throughout the courts of appeal, contrary to Congress' intent to create drug type and amount as all-purpose offense elements.

Because it is clear that quantity is an element of the offense here, the government having failed to plead and prove an essential element of the offense, requires an entry of acquittal. *Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000).

---

[7]    *See United States v. Coy*, 19 F.3d 629 (11th Cir. 1994) (cross-appeal) *United States v. McCann*, 940 F.2d 1352 (10th Cir. 1991) (cross-appeal); *United States v. Moreno*, 899 F.2d 465 (6th Cir. 1990) (cross-appeal); *United States v. Jenkins*, 866 F.2d 331 (10th Cir. 1989) (mandamus); 18 U.S.C. § 3742(b) (prosecution of criminal appeals requires personal approval of the Attorney General, the Solicitor General, or the Solicitor General's designee); *United States Attorney's Manual* § 9-2.170(A)(1 & 3) (appeals and mandamus requires DOJ level approval).

17

II.    ANY INSTRUCTION ON RELEVANT CONDUCT WILL VIOLATE
       KANDIRAKIS' RIGHTS TO DUE PROCESS AND A FAIR TRIAL
       PURSUANT TO THE SIXTH AND FOURTEENTH AMENDMENTS TO THE
       UNITED STATES CONSTITUTION.

It is well settled that the jury's role is to decide whether the Government has

satisfied its heavy burden of proving the defendant's guilt beyond a reasonable doubt

based upon the indictment. *In Re Winship,* 397 U.S. 358 (1970); *Blakey v. Washington,*

124 S.Ct. 2531 (2004).  In a conspiracy indictment, the jury's role then is it decides if the

Government proved beyond a reasonable doubt that the defendant was a member of the

conspiracy charged in the indictment. *United States v. Garcia Torres,* 280 F.3d 1,4 (1st

Cir. 2002).  To join a drug conspiracy, a defendant must agree with others to advance the

goal of the conspiracy - - - in this case to distribute oxcoytin. *See Id.* If the evidence

establishes agreements different from those charged, the Court must undertake a variance

evaluation.  A number of factors come into play n determining whether the evidence

establishes a single conspiracy, including: (1) the existence of a common purpose, (2) the

interdependency of various elements in the plan, (3) the degree of overlap. *United States*

*v. Martinez-Medina,* 279 F.3d at 114; *United States v. Riveria-Ruiz,* 244 F.3d 263, 268

(1st Cir. 2001).

Here, because the evidence demonstrates multiple sources, the evidence supports

multiple conspiracies.  For example, Adleman testified that his sources included a

female, an old man, Justin, and a guy from New Hampshire, in addition to Arco.  There is

no evidence that Kandirakis conspired with any of these source.  The evidence suggests

that Scilliano was Arco's supplier.  No evidence connects Kandirakis to Scilliano.  The

government suggests that Summa could be Kandirakis' supplier.  Although there is some

18

telephone contact between Kandirakis and Summa, the government offered no evidence
of any conversations and no connection to oxcycotin. As such, under the Pinkerton
doctrine, it is inappropriate to expand a defendant's agreement by the agreement of others
or the conduct of others.

Moreover, the fact that members of a conspiracy in fact distributed a certain
quantity may be circumstantial evidence of a defendant's agreement as to quantity, but it
should not be permitted to be conclusive. "Involved in the conspiracy" does not prove
that a defendant agreed to an amount. Any inclusion of drug quantity on the same verdict
slip as the determination of guilt or innocence, will prejudice Kandirakis because the jury
may wonder, if the defendant was not guilty, then why did the court go through so much
trouble to find out the amount of drugs Kandirakis' is responsible for. This reasoning
violates Kandirakis' right to a fair trial and due process of law pursuant to the Sixth and
Fourteenth Amendments to the United States Constitution. See *United States v. Spock*,
416 F.2d 165 (1st Cir.1969).

## III. ANY DETERMINATION OF WEIGHT BY THE JURY SHOULD BE MADE BEYOND A REASONABLE DOUBT AND SHOULD BE BINDING.

In support of its proposed verdict question, the Court relies on Derman v. United
States, 298 F.3d 34, 42-43 (1st Cir. 2002). In United States v. Vega, 398 F.3d 149, 151
(1st Cir. 2005), a case decided after United States v. Booker, -- U.S. --, 125 S.Ct. 738, 160
L.Ed.2d 621 (2005), the First Circuit held that an almost identical instruction,[8] which had

---

[8] The special verdict form in Vega read as follows: "If you find the defendant Felix Vega
guilty of the conspiracy charged in Count I, please answer the following question: 1) Do
you unanimously agree, by proof beyond a reasonable doubt, that the quantity of cocaine
which was distributed and/or intended to be distributed as part of the conspiracy was
more than five (5) kilograms as charged in the indictment?" Vega, 398 F.3d at 151.

19

been given in a drug conspiracy trial in September 2002, "<u>was</u> consistent with the law of

this circuit <u>at the time</u>, which allowed for the jury to make a finding as to the quantity of

drugs attributable to the conspiracy as a whole, and allowed the district court to make

individualized quantity determinations for each co-conspirator for sentencing purposes."

<u>Vega</u>, 398 F.3d at 151 (citing <u>Derman</u>, *id*) (emphasis added).

However, as the court in <u>Vega</u> points out, the instruction is no longer consistent

with the law of this circuit, post-<u>Booker</u>. The Supreme Court in <u>Booker</u> held that

sentencing facts must be charged and proved to a jury beyond a reasonable doubt.

Notably, the Court in <u>Booker</u> avoided expressing its holding in terms of the "statutory

maximum," referring instead to the "maximum authorized by the facts," <u>Booker</u>, --- U.S.

at ---, 125 S.Ct. at 752-53 (substantive majority opinion) (commenting that "[m]ore

important than the language used in our holding in <u>Apprendi</u> are the principles we sought

to vindicate").

In addition, the Supreme Court in <u>Blakely v. Washington</u>, ___ U.S. ___, 124 S.

Ct. 2531, 2537 (2004) has already stated:

> "Our precedents make clear, however, that the "statutory maximum" for
> *Apprendi* purposes is the maximum sentence a judge may impose *solely
> on the basis of the facts reflected in the jury verdict or admitted by the
> defendant*. See *Ring, supra*, at 602, 153 L. Ed. 2d 556, 122 S. Ct. 2428
> ("'the maximum he would receive if punished according to the facts
> reflected in the jury verdict alone'" (quoting *Apprendi, supra*, at 483, 147
> L. Ed. 2d 435, 120 S. Ct. 2348)); *Harris* v. *United States*, 536 U.S. 545,
> 563, 153 L. Ed. 2d 524, 122 S. Ct. 2406 (2002) (plurality opinion) (same);
> cf. *Apprendi, supra*, at 488, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (facts
> admitted by the defendant). In other words, the relevant "statutory
> maximum" is not the maximum sentence a judge may impose after finding
> additional facts, but the maximum he may impose *without* any additional
> findings."

The Sixth Amendment constraints on sentencing remain, even under a post-Booker advisory Guidelines system. *See, e.g.*, McMillan v. Pennsylvania, 477 U.S. 79, 87, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986) (due process will be violated when the finding of a sentencing factor becomes "a tail which wags the dog of the substantive offense"), *see also* Booker, --- U.S. at --- n. 6, 126 S.Ct. at 798 n. 6 (Thomas, J., dissenting in part) (stating that the Court's holding in Booker corrects the Sentencing Commission's mistaken belief, set out in U.S.S.G. § 6A1.3, p.s., that the preponderance of evidence standard is appropriate to meet due process requirements – "[t]he Fifth Amendment requires proof beyond a reasonable doubt, not by a preponderance of the evidence, of any fact that increases the sentence beyond what could have been lawfully imposed on the basis of facts found by a jury or admitted by defendant.").

As noted by the remedial majority in Booker, a district court's sentencing determination must be reasonable. Booker, 125 S.Ct. at 797 (Breyer, J., for the Court) ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing"); *id.* at 766 (noting that a court of appeals should review post-Booker sentences for "reasonableness"). Therefore, the upper limit of a lawful sentence is no longer the "maximum term of imprisonment" under a statute that sets out a generally broad range (i.e., the "statutory maximum"), but the highest point within that range that is "reasonable." *See* Booker, -- U.S. at --, 125 S.Ct. at 748-49, 754-56 (substantive majority opinion) (referring to upper limit as "maximum authorized by facts established" by guilty plea or jury verdict and stating that constitutional safeguards do not concern the ability of the legislature to define criminal conduct but involve only the required procedures for finding the facts that determine the

21

maximum permissible punishment), 765 (remedial majority opinion) (outlining standard of appellate review), 797 (Thomas, J., dissenting) (referring to upper limit as "lawfully imposed sentence"). For example, it would be unreasonable to sentence an individual to the statutory maximum, under 21 U.S.C. § 841(b)(1)(C), of twenty years for a first-time offender who distributed a tiny amount, such as one gram, of a controlled substance.

In order to comply with due process in determining a reasonable sentence, the court must ensure that the defendant is afforded procedural protections under the Fifth and Sixth Amendments in connection with any facts on which the government may seek at sentencing to increase the defendant's sentence, including the right to a jury determination of drug weight. *See* Blakely v. Washington, --- US. ---, 124 S.Ct. 2531, 2541, 159 L.Ed.2d 403 (2004) (noting that "when a defendant pleads guilty, the State is free to seek judicial sentence enhancements so long as the defendant either stipulates to the relevant facts or consents to judicial factfinding," i.e., waives his right to jury trial).

The defendant has a constitutional right under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment to this factual determination of drug weight as to him. See, Apprendi v. New Jersey, 530 U.S. 466, 476 (2000).

Respectfully submitted,
ROSEMARY CURRAN SCAPICCHIO
By his attorney,

/S/
Rosemary Curran Scapicchio
Four Longfellow Place
Suite 3703
Boston, Massachusetts 02114
(617) 263-7400
BBO # 558312

Marcie Vaughan
Law Student
Four Longfellow Place
Suite 3703
Boston, Massachusetts 02114

Dated September 26, 2005